In the Matter of CHICAGO, MILWAU-
KEE, ST. PAUL AND PACIFIC RAIL-
ROAD COMPANY, Debtor.

No. 77 B 8999.

United States District Court,
N. D. Illinois, E. D.

June 1, 1979.

John W. Rowe, Chicago, Ill., for the Trustee.

Henri F. Rush, Washington, D. C., for Interstate Commerce Commission.

Susan Getzendanner, Edmund J. Kenny, George A. Platz, III, Chicago, Ill., for various creditors.

O. Yale Lewis, Jr., Thomas J. Brewer, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., of counsel, for State of Montana and the Association to Save our Railroad Employment.

DECISION ON TRUSTEE'S PETITION FOR DIRECTION WITH RESPECT TO PARTIAL EMBARGO OF FREIGHT OPERATIONS

McMILLEN, District Judge.

On April 23, 1979, the Trustee of the above railroad (hereinafter referred to as the Milwaukee Road) petitioned the court to direct an embargo on certain of his freight operations effective May 8, 1979 at 12:01 a. m. Hearings were commenced on May 4, 1979 and continued before Special Master Milton H. Gray on May 15 through May 18, 1979. Master Gray filed his recommendations on May 25, 1979 and objections to the recommendations were filed by various parties on May 29, 1979. In the meantime the Master had considered scores of exhibits, testimony of all interested parties which totalled 1350 pages of transcript, and many written sworn statements which were admitted subject to cross examination. Obviously the court is greatly indebted to the Special Master and to all interested parties for the expeditious handling of this matter.

We have carefully examined the report of the Special Master and the several objections filed thereto. Many parties, including the indenture trustees, have not filed objections, but we assume the indenture trustees object to the Master's recommendations because they have filed a petition for a complete embargo. In any event, we have familiarized ourself with the record and find and conclude that the findings of fact contained on pp. 10 through 25 of the Master's report are supported by substantial evidence, to the extent not modified hereafter in this Decision.

However, we reluctantly disagree with his conclusions of law, in substance, for the reason that we cannot find any statutory or other authority for our entering the order requested by the Trustee. We say this "reluctantly" because we believe that the Master and the attorneys for the Trustee have conscientiously attempted to find a solution for the difficult problems of the Milwaukee Road, and the Trustee's proposal is one

which we believe would promote the public interest. However, every avenue which has been explored leads, in our opinion, to a road block, erected primarily by the Federal government.

The Trustee's petition and his attorneys' argument are based primarily upon 49 U.S.C. § 11125. This statute, enacted in substantially its present form on January 2, 1974 and amended in technical details on October 17, 1978, is entitled "Directed rail transportation." It provides in substance that the Interstate Commerce Commission may direct another carrier to handle the traffic available to the affected carrier for a maximum period of 240 days, with reimbursement to the directed carrier for certain additional expenses incurred by it. The purpose of this statute is presumably to substitute service by one carrier for another under certain conditions, the additional cost being borne by the United States government. Thus the affected carrier, the Milwaukee Road in this instance, would be temporarily relieved of its duties as a common carrier and the public interest would be served by its competitors.

The statute, however, imposes certain conditions precedent upon the Commission's discretion to direct service, as follows:

(a) When a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title *cannot* transport the traffic offered to it because—

(1) its cash position makes its continuing operation *impossible* ;

(2) transportation has been discontinued under *court order* ; or

(3) it has *discontinued* transportation without obtaining a required certificate under section 10903 of this title;

the Commission *may* direct the handling, routing, and movement of the traffic available to that carrier and its distribution over the railroad lines of that carrier by another carrier to promote service in the interest of the public and of commerce. . . . [Emphasis supplied to key words.]

In applying the foregoing statute, it must be noted at the outset that its requirements are apparently intended to be quite strict, as the emphasized words illustrate. The effect of the statute is to abrogate much of the Interstate Commerce Commission's primary jurisdiction to supervise abandonment or transfer of rail services. Hence Congress altered the procedures of the traditional administrative agency for only three narrowly defined, almost insoluble, crises. Each of these crises also seems to contemplate a complete, unavoidable, and not a partial, cessation of operations. Finally, the language of the statute is oriented toward action by the I.C.C., not by the reorganization court.*

. . . . .

The second alternative provided in § 11125 is when "transportation has been discontinued under court order." The Trustee apparently believes that this language confers implied authority upon this court to enter an order for a partial embargo, but we do not agree. His case has been brought into this court by a petition filed under § 77 of the federal Bankruptcy Act. Under § 77, this court is not only limited by the provisions of that statute but is also subject to review of most substantive decisions by the I.C.C. Section 77(*o*) of that Act (11 U.S.C. § 205(*o*)), provides that this court may authorize abandonment or sale of the debtor's properties upon certain conditions and after certain procedures have been followed, "but only with the approval and authorization of the Commission when required by chapter 1 of Title 49 . . .."

The latter section is currently contained at 49 U.S.C. § 10903 which provides in pertinent part that:

(a) A rail carrier providing transportation subject to the jurisdiction of the

---

* Certain portions of the original memorandum opinion released to the parties, unnecessary to its published form, have been eliminated. Those deletions are indicated hereafter by ellipses.

Interstate Commerce Commission under subchapter I of chapter 105 of this title may—

> (1) abandon any part of its railroad lines; or
>
> (2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.

. . .

We find it impossible to believe that Congress intended to by-pass the time-honored and elaborate administrative procedures of §§ 10903, 10904 and 10905 by enacting the bare-bones "court order" provision of § 11125(a)(2).

The Trustee strenuously contends that he is not "abandoning" any part of the railroad and that his petition is therefore not subject to § 10903. However, his evidence establishes that, once directed service is ordered on any portion of its line, the debtor is unlikely to be able to retrieve and reactivate that portion successfully. Furthermore, the Trustee concedes that he cannot reorganize the Milwaukee Road if it contains the portions sought to be embargoed. Therefore, in our opinion, the requested embargo for a substantial portion of the Road for a lengthy period of time does constitute a *de facto* abandonment. This cannot be ordered by this court except through the process of I.C.C. review mandated by § 10903.

If a partial temporary embargo is ordered, it also constitutes a form of a reorganization, the plans for which are likewise subject to approval by the I.C.C. after a statutory review procedure. The Trustee's evidence, supported in the main by a report of the management consulting firm of Booz, Allen & Hamilton (Trustee's Ex. 65), clearly indicates to us that a reorganization of the entire railroad is highly impractical if not impossible, and the Master agrees (Report pp. 19, 22).** The principal impediment to complete reorganization is the existence of the main line which would be subjected to an embargo, primarily that portion west of Miles City, Montana and between Kansas City and Chicago. If the Trustee is unable to reorganize these portions of the railroad and seeks an embargo followed by directed service of competing lines, he is in effect proposing at least a partial reorganization plan. For this additional reason, the "court order" alternative for discontinuing transportation under § 11125 is not available in this case.

It could be argued that § 11125 by implication amends and supersedes § 77(*o*) and § 10903 which were on the statute books long before the provisions of § 11125 now being discussed. However, it is well-recognized that statutes should be construed compatibly and that amendments or repeals by implication are disfavored. In *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) the Supreme Court restated its earlier holdings that it is " 'a cardinal principle of statutory construction that repeals by implication are not favored.' " 426 U.S. at 154, 96 S.Ct. at 1993. Equally important, the Court emphasized that, in the absence of a "clear intention otherwise," a statute dealing with a narrow, precise, and specific subject is not submerged by a later-enacted statute of a more generalized nature. 426 U.S. at 153, 96 S.Ct. 1989. Since Congress did not refer in any way to the Bankruptcy Act or its appendages in enacting § 11125, and since there are situations where a court order could cause discontinuance of transportation in cases where the railroad has not filed a petition under § 77, we can only conclude that the "court order" subsection of § 11125 does not refer to a court order of this court sitting in federal reorganization cases.

---

** This does not necessarily preclude additional priority borrowing if a viable portion of the railroad is reorganizable and such funds are necessary to maintain the railroad's operations pending that reorganization.

The Interstate Commerce Commission and its counsel have consistently taken the position that this court has no jurisdiction to order a partial embargo. Certainly that Commission and its counsel should be well-acquainted with the intricacies of the Interstate Commerce Act and § 77 of the Bankruptcy Act. In fact, the I.C.C. had taken this position earlier, giving Congress a clear opportunity to amend the statute if it intended a contrary interpretation. See *Lehigh and New England Railway Co. v. I. C. C.*, 540 F.2d 71, 81, fn. 28 (3d Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). Despite its disagreement with the Trustee's legal position, however, the Commission stands ready to direct service upon 36 hours' advance notice if we decide otherwise.

In short, we conclude that subsection (a)(2) of § 11125 does not afford this court independent authority to order a partial temporary embargo and that the provisions of the Bankruptcy Act and 49 U.S.C. § 10903 control any order which we could enter on this subject.

.    .    .    .    .

Either in recognition of the foregoing problems with § 11125 or in an effort to find an alternative ground for relief, the Trustee and the Master turn to the proposition that continued operation of the entire Milwaukee Road would result in an unconstitutional erosion of the rights of creditors, particularly secured creditors. The Master concludes that an order for a partial embargo would tend to promote the objectives of § 77 because it would result in a more reorganizable entity. This of course assumes, by implication at least, that the embargoed portions would be abandoned under any reorganization plan, to protect creditors from further erosion and to produce a plan of reorganization which will be feasible and in the interest of creditors as well as the public. However, the concept of an unconstitutional erosion of creditors' interests has not gone to the point of permitting a reorganization court to exercise equitable powers in derogation of the I.C.C.'s jurisdiction.

.    .    .    .    .

Perhaps the most pertinent decision on the constitutional issue is Judge Friendly's opinion for the Special Court *In the Matter of Valuation Proceedings Under §§ 303(c) and 306 of the Regional Rail Reorganization Act*, 439 F.Supp. 1351 (1977). In that case the court gave precedence to the requirements of the Interstate Commerce Act and § 77 in the matter of abandonment. It ruled that these statutory procedures must be followed even if the process results in a serious erosion of the railroad's property. It is the very nature of reorganization proceedings that creditors' rights be subordinated to those of the general public and subjected to financial losses, even though the reorganization process may take several months or years to reach fruition. Only if a railroad is faced with imminent "cashlessness" is a railroad justified in abandoning its service, according to the decision of the Special Court. When faced with a complete or substantial impossibility of continued operation because of a lack of working capital, the court ruled that a railroad cannot be required to do what it is unable to do, and that the only alternative is abandonment, a cessation of operations. See also *In re Penn Central Transportation Co.*, 384 F.Supp. 895, 919 fn. 31 (Special Court 1974).

Similarly, in *In re Central Railroad of New Jersey*, 485 F.2d 208 (3d Cir. 1973) (*en banc*) *cert. denied sub nom. Timpany v. New Jersey*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974), the court stated that termination of passenger service could not be ordered in a § 77 reorganization proceeding without following the I.C.C. notice and hearing route. *Accord, In re Erie, Lackawanna Railway Co.*, 517 F.2d 893 (6th Cir. 1975). Although none of these cases involved § 11125, they are instructive in applying that statute as well as for rejecting the concept of an unconstitutional erosion of creditors' rights.

It is perhaps unfortunate that the I.C.C. modified its regulation Part 1006 which until February 6, 1978 permitted embargo by a common carrier where "compelling circumstances beyond the control of the carrier" required it. By limiting this provision

to motor carriers after February 6, 1978, the Commission once again indicated its opinion that an embargo or partial embargo by a railroad should not be permitted except pursuant to the provisions of § 10903, although the foregoing regulation was not specifically directed toward the construction or scope of § 11125. In any event, as is pointed out in the objections of the State of Montana to the Master's report, the Trustee's reliance on 49 C.F.R. § 1006, now § 1059, is misplaced.

In finding that the Milwaukee Road is not "cashless" on the record in this case, and that its continued operation is not "impossible," we are painfully aware that the Trustee will be confronted by these conditions in the foreseeable future. They can be temporarily avoided by the pending petition for a certificate to borrow $20 million on a priority basis (the decision on which has not yet been reached), but they can be avoided even longer by the United States Congress as evidenced by Senate Resolution 81 (and House Resolution 341). We have been advised by the distinguished senators from Montana, Senators Melcher and Baucus, that passage of this ameliorative legislation is imminent.

While we as well as the Senators are aware of the unpredictability of the fate of emergency legislation of this sort, we must advert to the fact that continued operation of the Milwaukee Road for any length of time is almost entirely dependent upon financial relief from Congress. The findings of fact by Master Gray which we have approved make this crystal clear, particularly when the long-term operating deficits and substantial amounts of deferred maintenance are taken note of. Without summarizing these in this opinion, we call attention particularly to the findings on pp. 12 through 17 of the Master's report, most of which findings are incontrovertible on the record.

Congressional action is the only foreseeable alternative. We were advised in the hearing by representatives of the Interstate Commerce Commission that a petition for abandonment, if filed by the Trustee under § 10903, would necessarily consume several months before it could be acted upon, even then subject to appeal. The alternatives offered by § 11125 in its present form are certainly not in the public interest nor are they in the interest of the creditors. We have little doubt, however, that the Trustee will find continuing operation impossible or will be forced to discontinue transportation without obtaining a certificate under § 10903 in the foreseeable future, absent a release from the strictures of § 11125 or substantial and continued infusion of funds by the United States government.

For the reasons stated hereinabove, the objections of the State of Montana and others to the conclusions of law of the Special Master are sustained, and the Petition of the Trustee for Direction with Respect to Partial Embargo of Freight Operations is denied.